**Julie P. EIDE, Relator,**

v.

**PROJECT FOR PRIDE IN LIVING, Commissioner of Jobs and Training, Respondents.**

**No. C0-92-1123.**

Court of Appeals of Minnesota.

Dec. 15, 1992.

Brian D. Stofferahn, Henningson & Snoxell, Ltd., Minneapolis, for relator.

Laurence M. Ulrich, Oppenheimer, Wolff & Donnelly, Minneapolis, for Project for Pride in Living.

Kent E. Todd, St. Paul, for Com'r of Jobs and Training.

Considered and decided by FORSBERG, P.J., and RANDALL and DAVIES, JJ.

OPINION

RANDALL, Judge.

Relator Julie Eide seeks review by certiorari of a decision issued by a representative

of respondent Commissioner of Jobs and Training. The Commissioner's representative concluded Eide was disqualified from receiving unemployment compensation benefits. The Commissioner's representative reasoned that Eide's employer, respondent Project for Pride in Living ("PPL"), discharged Eide when she submitted more than 30 days notice of her intent to resign, and no statutory exception to disqualification applied to Eide's resignation. We remand for a factual determination as to whether Eide had an "important operational role" and thus would be allowed by PPL's own policy to submit an extended notice of resignation without retaliation.

## FACTS

Julie Eide was employed by PPL between 1986 and 1991. Eide worked 20 hours per week in PPL's store, earning $18.60 per hour. Her title at time of separation from employment was "Manager of Resource Development."

In October 1991, Eide decided to resign from PPL. Her reasons for resignation included: (1) the denial of her request for an extended leave of absence following a maternity leave; (2) her ineligibility for a newly-adopted discount incentive plan; (3) a personality conflict with her immediate supervisor; and (4) a feeling that her job was no longer personally or professionally satisfying. PPL's personnel policy stated:

> It is expected that staff members who have important operational roles, who have served the organization over a significant period of time, and whose functions require much experience and/or training *will give as much notice as possible of their intention to leave voluntarily,* in order to facilitate a transition to new leadership.

(Emphasis added.) Eide believed the above policy was applicable to her. She discussed her planned notice of resignation with two board members. The board members, although not in charge of PPL's day-to-day activities, agreed that at least eight weeks notice would be appropriate.

On October 3, Eide submitted her notice of resignation, effective the end of November. She submitted the notice to her immediate supervisor, Jeanette Fleury, and to Joe Selvaggio, the founder and executive director of PPL. Neither Selvaggio nor Fleury believed that Eide occupied an important operational position requiring an extended notice of resignation; however, Selvaggio accepted Eide's notice, and circulated a memorandum indicating that she would be working at PPL through the end of November.

On October 8, Eide met with Fleury, who stated that Eide's last day would be October 10. Fleury explained that she did not want Eide to work until the end of November because of tension in the office and because she did not want Eide to leave just before the Christmas season. Fleury offered to pay Eide through October 31. Eide declined the offer.

Upon her separation from employment with PPL, Eide applied to the Department of Jobs and Training for unemployment compensation benefits. Her claim was granted, and PPL appealed to a Department referee, who conducted a hearing. The referee considered evidence and testimony offered by Eide, Selvaggio, Fleury, three board members, and a representative of one of PPL's suppliers.

Following the hearing, the referee issued a decision reversing the award of unemployment benefits. The referee reasoned that Eide had voluntarily resigned without good cause attributable to PPL. Eide appealed to a commissioner's representative, who affirmed the referee's findings and decision. Eide has obtained a writ of certiorari, seeking review of the commissioner's representative's decision.

## ISSUE

Did the commissioner's representative err by determining that Eide's separation from employment was voluntary? [1]

---

1. Respondents also argue that Eide did not have "good cause to voluntarily quit." Our decision does not rest on an analysis of whether Eide had "good cause to voluntarily quit."

## ANALYSIS

An individual who voluntarily resigns from employment is disqualified from receiving unemployment benefits. Minn. Stat. § 268.09, subd. 1(a) (1990). The legislature has provided the following exception to disqualification:

An individual shall not be disqualified * * * under any of the following conditions:

\* \* \* \* \* \*

(5) the individual is terminated by the employer because the individual gave notice of intention to terminate employment *within 30 days*. This exception shall be effective only through the calendar week which includes the date of intended termination.

*Id.*, subd. 1(c)(5) (emphasis added). Here, Eide submitted her resignation notice on October 3. Her notice stated she intended to resign in 58 days, on November 30. Therefore, absent special circumstances, the exception to disqualification would not be applicable to Eide.

The referee and Commissioner's representative concluded this case is controlled by *Kalvar Datacorp v. Rynerson*, 374 N.W.2d 828 (Minn.App.1985). In *Kalvar*, the respondent employees submitted notices of intent to resign more than 30 days in the future. The *Kalvar* court specifically addressed the issue "whether giving notice of more than 30 days should preclude respondents from receiving unemployment compensation." *Id.* at 829. The court concluded:

It is apparent that the legislature enacted the 30-day exception to the voluntary-leave provision for purposes of fairness. It would be unfair to preclude an individual from receiving some benefits where an employer fired the individual after the individual provided a reasonable notice of intent to terminate. Reasonable notice in the eyes of the legislature is one given within 30 days of the termination date. It is fair to impose on the employer the burden to maintain the employee until the date of the employee's stated termination date when that date is within 30 days of the date of the notice. Converse-

ly, it would be unfairly burdensome to be expected to maintain such an employee for more than 30 days. The statute avoids the requirement for long term support of a lame duck employee. The employer may be anxious to begin training a new person, or the employer may feel constrained from implementing new plans until the replacement employee has begun work. Another conceivable situation was suggested in this case: the employer will not feel free to confide in the employee who is quitting.

*Id.* at 830. Thus, according to *Kalvar*, the legislature has struck a balance; an employee should not be penalized for providing an employer with 30 days notice, but the employee who provides over 30 days notice becomes a "lame duck", whom the employer may discharge without suffering unemployment compensation consequences.

Eide argues the *Kalvar* rationale is not applicable because she submitted her extended notice of resignation in accordance with PPL's policy. We agree. If Eide occupied an important operational role, PPL's policy required her to provide as much advance notice as possible to allow for an orderly transition. In light of PPL's policy of telling operational employees to provide extended advance notice of leaving, *Kalvar* is not on point. It would be unfair and illogical for an employer to encourage more than 30 days notice of leaving for their own business purposes, and then argue the employee who complies is now "a lame duck" and can be terminated quickly for business purposes, without unemployment compensation liability.

On this narrow set of facts, it would be inequitable to allow limited unemployment benefits to Eide if she had given 30 days notice, but to disallow those same benefits because she gave the lengthy notice her employer wanted.

Despite Eide's arguments as to her role, PPL's witnesses testified the extended notice of resignation policy was not applicable to Eide because she did not occupy an important operational position. Because the Commissioner relied on the statute, no factual determination of whether Eide had

an "important operational role" in the company was made. Accordingly, we remand for a factual determination of whether Eide occupied an important operational position. If the Commissioner's representative finds that Eide occupied an important operational position, she is entitled to receive the same 30 days of unemployment benefits she would have received had she waited to give her notice 30 days before leaving. If the factual determination is otherwise, Minn. Stat. § 268.09, subd. 1(a) and the *Kalvar* rationale are on point.

Our decision does not expose employers to "semi-permanent annuities" that encourage, as here, lengthy advance notice of leaving. Regardless if an employee were to give ninety days, six months, a years notice, et cetera, the employee is limited to no more than 30 days of unemployment benefits under Minn.Stat. § 268.09, subd. 1(c)(5).

Finally, we note our decision is limited to the unique situation where the employer's stated policy encourages lengthy advance notice of intention to resign.

### DECISION

If, on remand, it is determined that PPL's policy led Eide reasonably to believe she was occupying an important operational position requiring her to give as much notice as possible prior to resigning, Eide's compliance with that policy entitles her to receive 30 days of unemployment compensation benefits pursuant to the provisions of Minn.Stat. § 268.09, subd. 1(c)(5).

Reversed and remanded.